AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**04/13/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

04/13/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JD _____ DEPUTY

United States of America

v.

AMAN KHAN, a.k.a. "Amanullah Khan,"

Defendant

Case No. 5:22-mj-00230-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of February 10, 2020 through September 29, 2021 in the county of Riverside in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 38 | Fraud Involving Aircraft or Space Vehicle Parts in Interstate or Foreign Commerce |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Cristina Jones, Special Agent, U.S. DOT-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 13, 2022

_____
*Judge's signature*

City and state:   Santa Ana, California

Hon. Karen E. Scott, U.S. Magistrate Judge

AUSA:   Benjamin Lichtman      (213-399-0264)

## <u>AFFIDAVIT</u>

I, Cristina Jones, being duly sworn, declare and state as follows:

## I.   <u>INTRODUCTION</u>

1.   I am a Special Agent with the United States Department of Transportation, Office of Inspector General ("DOT-OIG"), and have been so employed since July 2019.  Previously, I was a Special Agent with the United States Department of Labor, Office of Inspector General, from February 2018 to July 2019.  I am assigned to the Western Regional Office in Cerritos, California, where I investigate matters concerning violations of Title 18 and Title 49 of the United States Code.  As a DOT-OIG Special Agent, I am responsible for investigating various types of fraud and safety violations related to DOT programs.

2.   I have completed three months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia. During my employment as a DOT-OIG Special Agent, I have participated in investigations related to transportation safety, wire fraud, mail fraud, fraud against DOT programs, and various other DOT-related violations.  I have participated in various aspects of criminal investigations, including bank-record analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.

## II. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for AMAN KHAN, also known as Amanullah Khan, (hereinafter "KHAN"), for violation of Title

18 U.S.C. § 38 (Fraud Involving Aircraft or Space Vehicle Parts in Interstate or Foreign Commerce).  This affidavit is also made in support of an application for a warrant to search 2900 Adams Street, Suite A-10, Riverside, CA 92504 ("SUBJECT PREMISES #1") and 2900 Adams Street, Suite A-23, Riverside, CA 92504, ("SUBJECT PREMISES #2") as described more fully in Attachments A-1 and A-2, for the items listed in Attachment B, which constitute the fruits, instrumentalities, and evidence of violations of Title 18 U.S.C. § 38 (Fraud Involving Aircraft or Space Vehicle Parts in Interstate or Foreign Commerce), 18 U.S.C. § 1343 (Wire Fraud), and 13 U.S.C. § 305 (Export Control Violations) (collectively, the "Subject Offenses").

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, arrest warrant, and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

3.   KHAN, through his company California Aircraft and Avionics Corporation ("CAAC"), has unlawfully manufactured and sold aircraft parts to private companies and government agencies, including NASA.  Specifically, KHAN has resold used

aircraft parts as new aircrafts parts, unlawfully manufactured
aircraft parts, and falsified documentation to mislead customers
as to the origin and status of those products.  To date, the
investigation has identified four transactions that involve
fraudulent documentation and/or fraudulent aircraft parts.
These transactions involve NASA, AvAir (an aircraft parts
broker), Ocean Air (an aircraft parts supplier), and Canamidex
(a Canadian-based procurement company), respectively.

4.    KHAN has engaged in similar conduct in the past.  In
November 2003 and August 2004, KHAN was convicted for nearly
identical conduct (falsifying records related to aircraft parts
and export control violations), for which the Honorable David O.
Carter, United States District Judge, sentenced him to 188
months' imprisonment.  KHAN formed CAAC shortly after his
release from federal prison.

### IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  Background**

5.    Based on my review of law enforcement reports, my
conversations with other experienced law enforcement agents, and
my personal participation in this investigation, I have learned
the following:

<u>Relevant Statutes and Regulations</u>

a.    Title 18, United States Code, Section 38, makes
it unlawful for someone to falsify or conceal a material fact
concerning any aircraft part, or make any materially fraudulent
representation concerning any aircraft part, or make or use any
materially false statement concerning any aircraft part.

b.   Title 18, United States Code, Section 38, makes it unlawful for someone to (1) export from or import or introduce into the United States, or (2) sell, trade, or install on any aircraft or space vehicle any aircraft or space vehicle part, by using or by means of a fraudulent representation, document, record, certification, depiction, data plate, label, or electronic communication.

c.   Title 14, Code of Federal Regulations, Section 21.9 provides as follows:

i.   If a person knows, or should know, that a replacement or modification article is reasonably likely to be installed on a type-certificated product, the person may not produce that article unless it is: (1) produced under a type certificate, (2) produced under an FAA production approval, (3) a standard part (such as nut or bolt) manufactured in compliance with a government or established industry specification, (4) a commercial part as defined in 14 CFR 21.1, (5) produced by an owner of operator for maintaining or altering that owner or operator's product, (6) fabricated by an appropriately rated certificate holder with a quality system, and consumed in the repair or alteration of a product or article in accordance with part 14 CFR 43; or (7) produced in any other manner approved by the FAA.

ii.   Except as provided in (a)(1) through (a)(2) a person who produces a replacement or modification article for sale may not represent that part as suitable for installation on a type-certificated product.

4

iii. Except as provided in paragraphs (a)(1) through (a)(2) of this section, a person may not sell or represent an article as suitable for installation on an aircraft type-certificated under §§ 21.25(a)(2) or 21.27 unless that article - (1) Was declared surplus by the U.S. Armed Forces, and (2) Was intended for use on that aircraft model by the U.S. Armed Forces.

d.    Title 13, United States Code, Section 305, makes it unlawful for any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration ("SED") (or any successor document) or the Automated Export System ("AES") subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

Federal Aviation Administration

e.    The Federal Aviation Administration ("FAA") is an agency within the United States Department of Transportation charged with ensuring the safety of aircraft operations in the United States.  The FAA regulates all civilian aviation matters in the United States and enforces the Code of Federal Regulations within its jurisdiction.

f.    The FAA approves the design of aircraft products (defined as aircraft, aircraft engine, or propeller) and articles (defined as materials, parts, components, processes, and appliances).  The FAA regulates those who may manufacture these approved products or articles.  See 14 C.F.R. § 21.

g.   A "type certificate" is a design approval issued by the FAA to a person who shows their product's design meets all applicable FAA design requirements.  See 14 C.F.R. §§ 21.11-21.55.)

h.   Production approval means a document issued by the FAA to a person that allows the production of a product or article in accordance with its approved design and approved quality system.  Production approval can take the form of a production certificates, parts manufacturer approval ("PMA"), or technical standard order ("TSO") authorization pursuant to 14 C.F.R. § 21.137.  For an aircraft part to be eligible for installation in a type-certificated aircraft, the part must be airworthy.  To be airworthy the part must have an approved or accepted design, be properly produced, properly maintained, and properly documented.  See 14 C.F.R. §§ 21.9, 21.131-150, 21.301-21.320, and 21.111 - 21.120.

i.   "Traceability documentation" is used and relied upon in the aviation industry to verify the origin, applicability, airworthiness, and chain-of-custody of aircraft parts.  The aviation industry relies on traceability documentation when a part is received and placed on an aircraft. An "Airworthiness Approval Tag," also referred to as "Federal Aviation Administration Authorized Release Certificate," and commonly referred to as a "FAA Form 8130-3," is considered traceability documentation and can only be certified by an individual authorized by the FAA.  Common status/work identifiers on an FAA Form 8130-3, which indicate a part is

airworthy, include, but are not limited to: "new," "new surplus," "overhauled," "repaired," and "inspected."  Members of the aviation industry and FAA representatives routinely rely on the accuracy of the information on FAA Form 8130's to determine the airworthiness of aircraft parts.

       j.    Traditionally, the FAA is particularly concerned about the possible introduction and use of unapproved aircraft parts in the aviation industry via fraudulent traceability documentation.  These types of parts are known as "Suspect Unapproved Parts" (or "SUPs").  SUPs lack one or more of the approved part requirements such as not having proper traceability documentation concerning the airworthiness of the part or not being manufactured or properly repaired by an FAA-certified person in accordance with the Code of Federal Regulations.

    **B.    California Aircraft & Avionics Corporation**

    6.    Based on my review of the California Secretary of State's website, I learned that KHAN registered CAAC with the Secretary of State on or around July 12, 2016.

    7.    I reviewed the website associated with CAAC: www.calaircorp.com.  Based on content on the website as of September 13, 2021, I learned that the company purportedly specializes in "advanced manufacturing for aircraft."  The website claimed that CAAC works with companies all over the globe, and works closely with defense department contractors, several air force bases, and U.S. aircraft manufacturers.  The website included an inventory list of over 2,000 parts that,

based on my training and experience, appear to be aircraft parts.

**C.    Aman Khan**

8.    I also conducted research into KHAN, the owner of CAAC.  I learned that on November 28, 2005, KHAN was sentenced in case numbers SA CR 02-80(B)-DOC and SA CR 04-152-DOC to 188 months' imprisonment.  In the 2002 criminal case, he was convicted of conspiracy to commit fraud involving aircraft or space vehicle parts in interstate commerce, in violation of 18 U.S.C. § 38(a)(3), and fraud involving aircraft or space vehicle parts in interstate commerce, in violation of 18 U.S.C. § 38(a)(2).  In the 2004 criminal case, he was convicted of conspiracy, in violation of 18 U.S.C. § 371, and failure to obtain a validated export control license, in violation of 22 U.S.C. § 2778.[1]  In addition to a 188-month term of imprisonment, KHAN was sentenced to three years' supervised release and ordered to pay nearly $5.5 million in restitution.

9.    Based on my review of the Bureau of Prisons website, KHAN was released from federal custody on or around May 4, 2016.  CAAC was registered with the Secretary of State approximately two months later, and, according to financial records I reviewed, KHAN opened a Chase bank account for CAAC on November 8, 2016, all within several months of his release from federal custody.

---

[1] The 2004 criminal case originated in the District of Columbia and was transferred to the Central District pursuant to Federal Rule of Criminal Procedure 20.

10.  I also accessed the United States System for Award Management on August 31, 2020 and learned that, in approximately October 2002, KHAN was excluded from receiving government contracts until July 2, 2052.

**D.   Investigation into CAAC's Transaction with AvAir**

11.  On August 28, 2020, DOT-OIG received a complaint from AvAir, an aircraft parts broker based in Chandler, Arizona, about aircraft parts purchased from CAAC.

12.  When I interviewed AvAir Vice President of Operations Tyler Botthof on August 31, 2020, I learned that in August 2020, AvAir purchased and received approximately $165,000 in aircraft parts from CAAC.  After receiving the parts, AvAir employees raised concerns about the traceability documents provided with the parts, including FAA Forms 8130-3 and a Certificate of Conformance ("COC") (a document that serves as an assurance that the part was produced and inspected using the applicable instructions and specifications for that part).

13.  On December 6, 2021, I spoke to Botthof via telephone and he said that AvAir would not have purchased the aircraft parts from CAAC without the FAA 8130-3 forms and the COC.  AvAir uses FAA 8130-3 forms to determine the condition of the parts and the value of the parts would be much lower without the FAA 8130-3 forms.

14.  On September 11, 2020, Mr. Botthof provided me with e-mails, invoices, photographs, and traceability documentation related to AvAir's transaction with CAAC.  Mr. Botthof also provided three FAA Forms 8130-3 (the documentation used to

verify the origin, applicability, airworthiness, and chain-of-
custody of aircraft parts) and one COC.  Based on my review of
those documents, I learned the following:

      a.   FAA Forms 8130-3 for part numbers 804351CL17
(Nozzle Turbine) and 804351CL22 (Nozzle Turbine), referred to as
"engine vanes" by Mr. Botthof, were both signed by "R. Brummer"
on October 23, 2003.  The particular version of Form 8130-3,
however, was the 2014 revised version, even though the signature
was dated October 23, 2003.  Both FAA Forms 8130-3 described the
parts as "new/tested" and manufactured by Therm Incorporated on
behalf of Pratt & Whitney.

    15.  On September 11, 2020, I accessed the FAA airmen
certification database which includes a listing of all certified
aircraft mechanics.  I found one mechanic with a first initial
of "R" and the last name of "Brummer": Richard Sylvan Brummer.

    16.  On November 10, 2020, DOT-OIG Jacob Sills interviewed
Mr. Brummer.  According to SA Sills' report, Mr. Brummer
confirmed that he is an aircraft mechanic, but he never worked
for Pratt & Whitney or Therm Corporation.  Mr. Brummer was an
aircraft mechanic for United Airlines beginning in 1989, but he
was laid off between 2002 and 2010.  Mr. Brummer also reviewed
the FAA 8130-3 forms received by AvAir and confirmed the
signature on those forms was not his.

    17.  On October 9, 2020, I spoke with Pratt & Whitney's FAA
Liaison, Kevin Kiss.  Mr. Kiss told me that Pratt & Whitney had
not manufactured the two parts listed in the FAA 8130-3 forms
sent to AvAir, nor had any of Pratt & Whitney's vendors

manufactured those parts, since 2000.  Mr. Kiss further explained to me that had Pratt & Whitney (or its designee) manufactured those parts, the FAA 8130-3 forms would have been signed by a Pratt & Whitney designee.  Mr. Kiss confirmed that "R. Brummer" was not associated with Pratt & Whitney.

18.  In addition to the two FAA 8130-3 forms provided to AvAir that I reviewed, I also reviewed a Pratt & Whitney COC for part number 742686CLA (Spacer Plate) signed by Alan J. Burch on June 17, 2020.  When I discussed this COC with Mr. Kiss on October 9, 2020, I learned the following:

a.  Mr. Kiss said the COC did not resemble an authentic Pratt & Whitney COC.  Mr. Kiss, however, confirmed that Alan J. Burch had worked for Pratt & Whitney until August 2020, at which time he retired.

b.  Mr. Kiss retrieved an electronic version of Alan J. Burch's signature in his files, and advised me that the signatures did not match.

19.  On December 1, 2021, U.S. Defense Criminal Investigative Service (DCIS) Special Agent (SA) Cory Oravecz and I interviewed Alan Burch via telephone.  In that interview I learned the following:

a.  Burch confirmed that he worked for Pratt & Whitney until July 31, 2020.

b.  Burch reviewed the COC for part number 742686CLA and said it looked unusual and not consistent with normal Pratt & Whitney COCs.

c.   Burch did not think the signature on the COC was his but said it looked like a good attempt at his signature.

20.   On February 3, 2022, Brian Warren, Associate Director of Investigations & Compliance at Pratt & Whitney, provided me a report summarizing their review of traceability documents and photographs of corresponding aircraft parts I provided.

21.   On February 10, 2022, DCIS SA Cory Oravecz and I discussed the report with Pratt & Whitney Regulatory Compliance Manager Jeff Eagle, Engineer Joe Hillmon, Attorney Sara Kornbluh, and Warren via telephone.  In that discussion, I learned the following:

a.   Eagle explained that the FAA 8130-3 forms for part numbers 804351CL17 (Nozzle Turbine) and 804351CL22 (Nozzle Turbine) had several anomalies. The FAA 8130-3 forms named Therm Incorporated as the issuing organization, however, Eagle confirmed that Therm Incorporated has no direct ship authorization for Pratt & Whitney parts and does not have any parts manufacturing approval.

b.   Eagle confirmed that Pratt & Whitney had no record of employee "R. Brummer."

c.   Based on the photographs provided of part numbers 804351CL17 and 804351CL22, Hillmon determined that the photographs actually showed part number 477251, making the FAA 8130-3 forms inaccurate.

d.   Hillmon explained that CL17 and CL22 were class numbers of part number 804351 based on the dimensions of the part. Hillmon compared the engineering drawings for parts 804351

12

and 477251 and determined that the parts shown in the photographs matched the drawings for part number 477251. The report stated that parts 804351 and 477251 are made from different materials with different material compositions and mechanical properties and are not interchangeable.

22. Based on (1) the FAA 8130-3 form indicating a signature date that predates the creation of the form, (2) the FAA mechanic's confirmation that he did not sign the FAA 8130-3 form, (3) the manufacturer finding several anomalies in the FAA 8130-3 forms and their conclusion that the parts were misrepresented on the FAA 8130-3 forms, and (4) the manufacturer's opinion that the COC for the spacer plates did not appear authentic, I have concluded that the documentation provided to AvAir is fraudulent and that the aircraft parts sold by CAAC are likely fraudulent as well.

**E.   Interview of CW-1**

23. On October 23, 2020 and November 13, 2020, SA Carlos Olivo (U.S. Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement) and I interviewed a cooperating witness ("CW-1"). CW-1 formerly served as Vice President of CAAC.[2] CW-1 told us, in pertinent part, the following:

---

[2] In 2012, CW-1 was convicted at trial of conspiracy, mail fraud, and wire fraud after having testified in his own defense. CW-1 was sentenced to 30 months' imprisonment. CW-1 is cooperating with the investigation in the hope that he will not be charged with criminal conduct. CW-1 has requested letter immunity from investigators but no immunity has been extended to him, nor has CW-1 been compensated for the information he has provided.

a.   CW-1 served as Vice President of CAAC for two years.  He held an approximately 30% ownership interest in the company.

b.   CW-1 met KHAN, the co-owner and President of CAAC, in approximately 2016 at a halfway house, after both had been released from federal prison.  At the time, KHAN had already established CAAC, and CW-1 joined him as Vice President. The business plan of CAAC focused on the sale of aircraft parts in an effort to generate enough revenue to develop a hydrogen engine for use in aircrafts.

c.   KHAN manufactured several types of aircraft parts that were sold to CAAC customers in the United States and abroad.  CAAC also purchased aircraft parts from other companies and re-sold them to CAAC customers.

d.   KHAN manufactured jet engine wheels which CAAC sold to KAN Associates.  KAN Associates purchased the wheels on behalf of NASA.

e.   KHAN prepared and provided CW-1 aircraft part paperwork that CW-1 included with parts shipments to CAAC customers.  This included COCs (a document certifying that parts were manufactured and inspected to meet the required specifications) which KHAN prepared with a signature that read "John Lubadnick."  KHAN explained to CW-1 that KHAN was authorized to use Lubadnick's signature on COCs.  At the time, CW-1 believed that KHAN could manufacture aircraft parts and Lubadnick could sign off on the associated paperwork.  Now,

however, CW-1 believes that Lubadnick is a fictitious person and an alias used by KHAN.  CW-1 never met or saw Lubadnick.

       i.   I searched the name "John Lubadnick" in a law enforcement database used to identify contact information for potential witnesses and found no results for anyone by that name in the United States.

       ii.  KHAN rarely used his real name. KHAN signed documents using the alias "Alex Martin." KHAN told CW-1 that he used this name because it was easier to sort his e-mails.

       f.   With respect to the engine vanes sold to AvAir, CW-1 said that those parts had been purchased from another company and resold to AvAir.  CW-1 believes KHAN cleaned the parts with a chemical and marked them with a part number that matched the purchase order form.  CW-1 had not seen the FAA 8130-3 forms signed by "R. Brummer" but said that KHAN would have prepared any paperwork associated with the parts.

       g.   CW-1 said that CAAC sold aircraft parts that are subject to export controls and that may require an export license.  CAAC, however, never applied for an export license from the U.S. Department of Commerce or the U.S. Department of State.  Instead, international customers had to arrange for their own shipping because CAAC told customers that it could not ship internationally.

       i.   When I reviewed CAAC's Wells Fargo bank statements, I saw several transactions between CAAC and aviation companies.  I identified approximately 66 potential customers of CAAC, including at least 16 international customers.

h.    In or around August 2020, KHAN fired CW-1.  It was around that time that CW-1 claims to have discovered KHAN was barred from selling to the government and then contacted the U.S. Department of Commerce to provide information about KHAN.

i.    CW-1 said that KHAN transferred $400,000 from the CAAC Wells Fargo bank account into his (KHAN's) personal bank account, including $150,000 on the day CW-1 was terminated.  On October 15, 2020, CW-1 closed all CAAC Wells Fargo accounts and obtained a cashier's check in the amount of $10,000 payable to CAAC.

i.    According to CAAC's Wells Fargo bank statements, between August and September 2020, KHAN transferred approximately $343,000 from the CAAC's Wells Fargo accounts into his own personal Wells Fargo account.

j.    According to CW-1, the only other employee of CAAC was machinist Hen Hua.

**F.    CAAC's Transaction with NASA**

24.    SA Olivo shared with me CAAC purchase orders and invoices that CW-1 had provided to him.  Among the documents, I saw an invoice for two wheels sold to a customer identified as Kay & Associates, Inc., with a contact email address of april.d.kell@nasa.gov.

25.    On December 7, 2020, I spoke to the user of the e-mail account april.d.kell@nasa.gov, April Kell, who confirmed that Kay & Associates, Inc. is a NASA contractor that makes purchases on behalf of NASA.

26.   On December 7, 2020, NASA Transportation Officer Peter
Llanes gave me documents related to the purchase of two wheels
from CAAC.  The FAA 8130-3 identified "WHEEL, LANDING GEAR" with
part number 219A55 and listed the status as "New/Inspected."
CAAC was identified as the manufacturer of the wheels.  The FAA
8130-3 was signed by "Ed Reaves" on February 24, 2020.

27.   Before reviewing these documents, in November 2020, I
had confirmed with the FAA that CAAC is not an FAA Production
Approval Holder authorized to manufacture aircraft parts.  I
also confirmed that KHAN is not an FAA designee or a person
authorized to sign FAA 8130-3 forms.

28.   On January 26, 2021, I conducted internet research on
approval/authorization number "NCUR282K," as shown on the FAA
Form 8130-3 and found that the number is associated with an FAA
certified repair station, Aviation Plus, located in Miami,
Florida.

29.   Based on information found on the Florida Secretary of
State's website, Aviation Plus was registered by "Carl Edward
Reaves." I searched "Carl Edward Reaves" in the FAA airmen
certificate database, which includes all aircraft mechanic
certificates, and found a Carl Edward Reaves, from Miami,
Florida, who holds a repairman certificate.

30.   On January 28, 2021, I obtained a copy of Carl Edward
Reaves' Florida driver's license and compared the signature on
the driver's license to the signature of "Ed Reaves" on the FAA
form 8130-3 and, based on my opinion, the signatures did not
match.

31.  On February 18, 2021, DOT-OIG SA Santos Ramirez interviewed Carl Edward Reaves, President of Aviation Plus. From reading Ramirez's report, I learned the following:

a.  Reaves confirmed that Aviation Plus is an FAA certified Part 145 repair station assigned certificate number NCUR282k.

b.  Reaves reviewed the FAA Form 8130-3 for part number 219A55 (wheel) and said that the signature on form was not his.

c.  Aviation Plus does not perform maintenance on new parts and only performs maintenance on parts for which they hold authorization.

d.  Aviation Plus does not perform maintenance on landing gear or tires, and/or wheels. Blocks 13a to 13e on the Form 8130-3 (used for newly manufacture parts) were all incorrect because, as a repair station, Aviation Plus would only annotate and/or sign blocks 14a to 14e (used for repaired parts).

e.  Reaves said that he had not heard of CAAC.

32.  On January 28, 2021, I confirmed with the FAA that newly manufactured aircraft parts with an FAA Form 8130-3 (indicating that the parts are FAA approved), should identify a legitimate Production Approval Holder and, as noted above, CAAC is not a Production Approval Holder.  In addition, I learned that the form should have been signed by an FAA designee or an employee of a legitimate Production Approval Holder, not a repairman such as Carl Edward Reaves.  In other words, Carl

Edward Reaves does not have the authority to sign FAA Forms 8130-3 for newly manufactured aircraft parts.

33.  On March 11, 2021, U.S. Defense Criminal Investigative Service (DCIS) SA Cory Oravecz and I interviewed Natalie Morrison and Deborah Palmer, both Contract Administrators for Jay-Em Aerospace Corporation.  From that interview, I learned the following:

a.  Morrison and Palmer explained that Jay-Em is the sole manufacturer of part number 219A55 (wheel) and has not authorized or licensed any third party to manufacture the part.

b.  Jay-Em manufactures the part solely for military use, not commercial aviation. Because the part is not manufactured for commercial aviation, Jay-Em does not have FAA Parts Manufacturer Approval. However, Jay-Em is the owner of the technical data for the wheel and the sole manufacturer of part number 219A55. Palmer and Morrison believe that a third party vendor was passing themselves off as an authorized manufacturer of the wheel.

34.  Jay-Em conducted an inspection of the wheels purchased by NASA (part number 219A55) and summarized their findings in a report dated March 31, 2021. Based on my review of that report, I learned the following:

a.  Jay-Em visually confirmed that the wheels were counterfeit. Discrepancies included a different bolt hole pattern and stamps inconsistent with Jay-Em practices. The report included a side-by-side photograph of Jay-Em's part number 219A55 wheel and the wheel purchase by NASA. The parts

19

were visually different; they were not the same color and the
wheels purchased by NASA did not have the same ridges as the
Jay-Em wheel.

      b.   The report stated that Jay-Em owns all technical
data associated with part number 219A55 and has not licensed any
third parties to manufacture the part.

      c.   The report emphasized that the use of such
counterfeit parts is a major safety concern that could result in
the loss of life.

   35.  On December 28, 2020, NASA-OIG SA Mark Gangloff gave
me additional documents regarding the transaction between CAAC
and Kay & Associates, Inc.

      a.   Those documents included a COC for two wheel
assemblies (part number 219A55) signed by "John Lubadnick" on
February 3, 2020.

      b.   The documentation also included a Kay &
Associates, Inc. form entitled "Representations and
Certifications" that had been signed by CW-1 on February 3,
2020.  That form included a certification that "neither the
seller, nor its principals, is debarred, suspended, or proposed
for debarment by the Federal Government."

      c.   SA Gangloff also provided me with FAA 8130-3
forms (which appeared to be similar to those CW-1 provided to SA
Olivo) and a credit card statement showing a payment to CAAC on
May 27, 2019 in the amount of $6,011.20.

   36.  Based on (1) CW-1's statement that KHAN personally
manufactured the wheels; (2) the FAA mechanic's confirmation

that he did not sign the FAA Form 8130-3;(3) the fact that KHAN signed the COC himself using an alias; and (4) Jay-Em's determination that the wheels were counterfeit, I have concluded that the documentation provided to Kay & Associates/NASA is fraudulent and that the aircraft parts sold by CAAC are fraudulent as well.

**G.   CAAC's Transaction with Ocean Air**

37.   On August 24, 2021, Federal Bureau of Investigation ("FBI") SA Travis Rankin informed me that he received a complaint from Florida company Ocean Air regarding parts they purchased from CAAC.

38.   On September 3, 2021, SA Rankin, SA Oravecz, and I interviewed Ocean Air Vice President Tony Motisi. In that interview, I learned the following:

a.   In approximately April 2021, Ocean Air received a purchase request from the North Atlantic Treaty Organization (NATO) for aircraft turbine gas nozzles.

b.   In order to fulfill the request, Ocean Air purchased 68 nozzles (part number 804351CL21) from CAAC. However, upon receipt and inspection of the parts, Ocean Air realized that they received an older version of the nozzles, part number 477251CL8, instead of the requested part number 804351CL21.

c.   The nozzles had requested part number 804351CL21 stamped on them, but still had part number 477251CL8 etched in the buttress.  These parts typically have the part number etched in the buttress.

     d.   The FAA Form 8130-3 provided to Ocean Air by CAAC indicated that the parts were part number 804351CL21, in new condition, and manufactured by Therm Incorporated for Pratt & Whitney.

     e.   Ocean Air contacted Therm and learned that Therm had not manufactured the nozzles for 25 years.

     f.   Motisi now believes the FAA Form 8130-3 provided by California Air is fraudulent. Ocean Air would not have purchased the parts without an FAA 8130-3.

39.  Based on my review of the records provided by Ocean Air I learned the following:

     a.   On May 11, 2021, Ocean Air submitted a purchase order to CAAC for 68 nozzles (part number 804351CL21).

     b.   On May 13, 2021, Ocean Air wired CAAC $80,000.

     c.   The FAA Form 8130-3 provided by CAAC to Ocean Air was for "Nozzle, Turbine Gas," part number 804351CL21, the status/work was "new/tested," were manufactured by Therm Incorporated, and signed by "R. Brummer" on November 26, 2013.

     d.   The version of the FAA Form 8130-3 was dated February 2014, even though it had purportedly been signed on November 26, 2013.

     e.   The FAA Form 8130-3 was very similar to the form provided to AvAir, including that it was signed by "R. Brummer." As noted above, R. Brummer was interviewed by SA Sills on November 10, 2020 and told SA Sills that he was never employed by Therm Incorporated or Pratt & Whitney.

40.  On February 3, 2022, Brian Warren, Associate Director of Investigations & Compliance at Pratt & Whitney, provided me a report summarizing their review of traceability documents and photographs of corresponding aircraft parts I provided them.

41.  On February 10, 2022, DCIS SA Cory Oravecz and I discussed the report with Pratt & Whitney Regulatory Compliance Manager Jeff Eagle, Engineer Joe Hillmon, Attorney Sara Kornbluh, and Warren via telephone.  From that interview, I learned the following:

    a.  Eagle noted several anomalies in the FAA 8130-3 form for part number 804351CL21 (Nozzle Turbine). The FAA 8130-3 forms named Therm Incorporated as the issuing organization, however, Eagle confirmed that Therm Incorporated has no direct ship authorization for Pratt & Whitney parts and does not have any parts manufacturing approval.

    b.  Pratt & Whitney had no record of employee R. Brummer.

    c.  Based on the photographs provided of part number 804351CL21, Hillmon determined that the photos actually showed part number 477251, making the FAA 8130-3 form inaccurate.

    d.  Hillmon explained that CL 21 was the class number of part number 804351 based on the dimensions of the part. Hillmon compared the engineering drawings for part number 804351 and part number 477251 and determined that the parts shown in the photographs matched the engineering drawings for part number 477251.

e.   The report stated that parts 804351 and 477251 are made from different materials with different material compositions and mechanical properties and are not interchangeable.

42.   Based on (1) the FAA Form 8130-3 indicating a signature date that predates the creation of the form; (2) the FAA mechanic's confirmation that he did not work for the alleged manufacturer; and (3) the manufacturer finding several anomalies in the FAA 8130-3 form and their conclusion that the parts were misrepresented on the FAA 8130-3 forms, I have concluded that the documentation provided to Ocean Air is fraudulent and that the aircraft parts sold by CAAC are likely fraudulent as well.

**H.   CAAC's Transaction with Canamidex**

43.   On January 11, 2022, DCIS SA Cory Oravecz and I spoke to NATO personnel via WebEx.  From that conversation and follow-up e-mails with NATO Senior Contracting Officer Antoine Saffers, I learned the following:

a.   In April 2021, NATO issued a purchase order for several aircraft parts to a Canadian company called Canamidex. At the time of the interview, NATO had received approximately 25 items.

b.   After receiving the parts, NATO reached out to several original equipment manufacturers ("OEMs") identified on FAA 8130-3 forms and/or certificates of conformance, and at least six of those OEMs informed NATO that the documents were fraudulent.

c.   NATO learned that Canamidex purchased the parts in question from CAAC.

44.   On January 14, 2022, Canamidex's attorney Kimberly Jaimez e-mailed me to report that Canamidex had been defrauded out of $1.2 million by CAAC.  On January 21, 2022, Jaimez e-mailed me invoices, purchase orders, bank wire reports, traceability documents, and e-mails related to parts purchased by Canamidex from CAAC.

45.   Included in the documents was a purchase order from Canamidex to CAAC for 173 units of part number 9542482 (Stator Tube, Torque, Brake) for a total price of $1,937,600. Also included in the documents provided were bank wire reports showing a total of approximately $558,609 in wire transfers from Canamidex to CAAC from May 2021 through September 2021.

46.   Based on CAAC financial records I reviewed, Canamidex wired approximately $1.4 million to CAAC from July 2020 through October 2021.

47.   I reviewed FAA Form 8130-3 for part number 9542482 provided by CAAC to Canamidex.  The FAA Form 8130-3 stated that the form was issued by Meggitt North Hollywood Inc., 12838 Saticoy Street, North Hollywood, CA 91605 ("MNH"). The 8130-3 form was signed by Jesse K. Russo on September 29, 2021.

48.   On February 7, 2022, FBI SA Travis Rankin and I visited MNH and spoke to Senior Vice President Jaime Rodriguez and Quality Assurance Director Raminda Aluwihare. Rodriguez and Aluwihare reviewed the FAA 8130-3 form and informed us that there was no employee named Jesse K. Russo at their facility.

In addition, only two employees at that facility are authorized to sign FAA 8130-3 forms, neither of whom is named Jesse K. Russo.  Rodriguez said that the MNH facility only manufactures engine parts, and that the part shown on the FAA 8130-3 form was not an engine part.  Rodriguez searched MNH's system and found no record of the part number or order number shown on the FAA 8130-3.

49.  On March 4, 2022, I received an email from Eric Lardiere, Senior Vice President, Secretary and General Counsel of MNH's parent company, Meggitt-USA, Inc.  In that email, Mr. Lardiere told me the following:

a.  The COC and 8130-3 form for the above-referenced transaction were not issued by any Meggitt company, including MNH, Meggitt Aircraft Braking Systems Corporation ("MABS"), located in Akron, Ohio, or its subsidiary, Meggitt Aircraft Braking Systems Kentucky Corporation ("MABSKY"), located in Danville, Kentucky.

b.  MNH is not a manufacturer of aircraft brake parts.  MABS (and its subsidiary, MABSKY) manufacture brake parts.

c.  The description of part number 9542482 is incorrect.  Part number 9542482 is a Torque Tube Assembly.  The Torque Tube part number is 9550031-1.  There is no description in the MABS systems as reflected in the documents such as "Torque, Stator Tube."

d.    MABS does not sell these parts through distributors.  A Purchase Order from the end user must come to MABS.

e.    The only customer to whom MABS has ever shipped these parts is a single Air Force Base.  The last shipment of this part number was two pieces to Hill AFB on July 26, 2021. Deliveries have been sparse over the past several months, and there have been none for a quantity of 20.

f.    Regarding the 8130-3 form, Mr. Lardiere stated that MABS is not authorized by the FAA to provide an 8130 tag to military customers, including the U.S. military.

g.    The 8130 tag is not from the same template the MABS uses and it contains multiple discrepancies.  Among other things, if this were a legitimate document, it would have been issued by MABS's subsidiary MABSKY.  Furthermore, the signatory, Jesse K. Russo, is not an employee of MABS or any Meggitt company.

h.    Regarding the COC, Mr. Lardiere stated that while the address on the document was that of Meggitt Aircraft Braking Systems Corporation in Akron, Ohio, the only address that would issue a COC for this part number is MABSKY, located in Danville, Kentucky.

i.    The template for the COC is different than Meggitt's template, and the document contains multiple errors, including the lack of a list of applicable regulatory requirements in the header, the fact that the certificate statement at bottom is not Meggitt's standard, and the fact that

the signatory, John Randell, is not an employee of MABS or any
other Meggitt company.

50.  I also reviewed another COC issued by CAAC for part
number 312261 provided to Canamidex.  The COC stated that it was
signed by "John Lubadnick" on May 14, 2021.  As previously
noted, CW-1 said that he believes Lubadnick does not exist.

51.  CAAC also provided Canamidex a Pratt & Whitney COC for
part number 312261. The COC stated that it was signed by Alan J.
Burch on May 17, 2021.  When DCIS SA Oravecz and I interviewed
Burch on December 1, 2021, Burch reviewed the COC and said he
retired on July 31, 2020, and there was no way his signature
should be on this COC.  Burch also said that his electronic
signature was a scanned version of his actual signature and not
a typed version as shown on this COC.

52.  When DCIS SA Oravecz and I spoke to Pratt & Whitney
employees on February 10, 2022, they told us that the logo on
this COC was backwards, the Pratt & Whitney shipping address was
incorrect, and employee Alan Burch retired in July 2020.

53.  Based on the e-mails provided, I learned that on
October 26, 2021, Canamidex requested additional documentation
regarding aircraft parts due to issues found with the parts by
NATO.  Canamidex e-mailed "Alex Martin" and carbon copied KHAN.
On October 27, 2021, KHAN responded to Canamidex and provided
information regarding the engineering drawings for the aircraft
parts.

**I.   Additional Complaints regarding CAAC**

54.   On August 27, 2021, SA Olivo informed me that his office received a complaint regarding CAAC from Defense Trading Corporation (DTC). On September 27, 2021, I spoke to DTC Contract Manger Ena Mitchell who told me that DTC was in the process of purchasing impellers from CAAC to fulfill a contract with NATO, but cancelled the order after they received a questionable General Electric (GE) COC from CAAC. According to Mitchell, the COC did not look authentic and when she looked at the document properties, she could see that the document was created by KHAN. Based on documents Mitchell provided me, the purchase order for the impellers was dated February 11, 2021 and a second order for nozzles was dated June 10, 2021. DTC received the questionable COC for the impellers on July 15, 2021 and cancelled both orders with CAAC that same day. I also looked at the properties of the Microsoft Word COC and saw that "Aman Khan" was the author and "Kathie Clowett" last saved the document. The content creation date was July 15, 2021, despite the COC being signed with the typed signature of "Alen Jon" on March 24, 2021, predating the document's creation.

55.   On September 22, 2021, SA Olivo informed me that his office received a complaint regarding CAAC from AeroBase. On September 29, 2021, I spoke to AeroBase Director of Sales Alexina Cyr and learned the following:

     a.   AeroBase submitted a purchase order to CAAC for a GE jet engine fuel pump on May 5, 2021.

     b.   AeroBase wired a deposit of $5,640.20 to CAAC.

29

c.     AeroBase had a hard time getting ahold of anyone at CAAC after the deposit was made.  On August 24, 2021, an AeroBase employee was able to get ahold of "Kathie" at CAAC via telephone who said she would follow-up on the order.

d.     After this phone call, Aerobase asked for GE documentation for the part but never received anything. At the time of the interview, Aerobase had not received the part and or heard from anyone at CAAC since the end of August 2021.

**J.     Review of CAAC Financial Records**

56.   Based on my review of CAAC financial records, including Wells Fargo, Chase, Citibank, and City National bank account statements, I learned that from January 2017 to February 2022, CAAC received approximately $3.5 million in incoming checks and wire transfers, primarily from aviation- related companies.  Of that amount, approximately $1.7 million came from international companies, including companies located in Dubai, Indonesia, Singapore, Malaysia, Portugal, South Africa, Germany, and Canada.

57.   Based on my review of account opening forms for CAAC bank accounts with Wells Fargo, Chase, Citibank, and City National, I learned that KHAN opened each account and identified himself as the President of CAAC.

58.   I also reviewed KHAN's personal Wells Fargo account records.  According to those records, between August and September 2020, KHAN transferred approximately $343,000 from the CAAC's Wells Fargo accounts into his own personal Wells Fargo account.  On August 20, 2020, Khan wired $178,000 from his

personal account to Damac Homes which, based on internet
research, appears to be a real estate company in Dubai.  On
October 15, 2020, KHAN withdrew the remaining balance of
$136,945 from his personal Wells Fargo account.

**K.    Shipper's Export Declarations Forms and Export
Licenses**

59.  SA Olivo informed me that, based on Department of
Commerce Records, from January 1, 2016, to September 24, 2021,
CAAC filed only three Shippers Export Declaration forms, despite
CAAC financial records showing numerous transactions with
international customers.

60.  SA Olivo conducted a records check and informed me
that, as of September 15, 2021, CAAC had only submitted two
export license applications with the U.S. Department of
Commerce. The first license application was for various parts
headed to Taiwan and was returned without action on December 15,
2020 because the parts did not require an export license. The
second application was also returned without action and
indicated that CAAC may not export the listed items to the
entity identified (located in Dubai) as the ultimate consignee.

**L.    Federal Search Warrant for CAAC Email Accounts**

61.  On January 25, 2021, the Honorable Autumn D. Spaeth,
United States Magistrate Judge for the Central District of
California, authorized a warrant to search four email addresses
associated with CAAC, including an email account used by CW-1,
KHAN's email account, an email account used by a suspected alias

of KHAN, and a general mailbox for CAAC (with the user name "info"). I reviewed several e-mails and learned the following:

   a. I found e-mails between CAAC e-mail accounts and AvAir. I also found e-mails between CAAC e-mail accounts and NASA contractors (Kay & Associates). The e-mails detailed the purchase transactions described above.

   b. I found an e-mail dated April 27, 2020, from "Alex Martin" responding to a potential customer's question about aircraft part 219A55 (the wheels sold to NASA as described above) by saying, "All factory new material… these parts were manufactured for NASA program." As previously noted, CW-1 said that "Alex Martin" is an alias used by KHAN.

   c. I found at least seven certificates of conformance signed by "John Lubadnick" addressed to customers for various aircraft parts. As previously noted, CW-1 said that he believes Lubadnick does not exist.

   d. I found several e-mails between CAAC e-mail accounts and domestic and international companies inquiring about purchasing aircraft parts. Including, over 100 e-mails in which, KHAN or "Alex Martin" offered customers FAA Forms 8130-3 with their purchases.

   e. The account information for "aman@calaircorp.com" listed the user's name as Aman Khan, phone number of (747) 206-3304. The account information for "alex@calaircorp.com" listed the user's name as Alex Martin with the same phone number as KHAN (747-206-3304) and an alternate e-mail address of

"akavionics1@gmail.com." CW-1 has identified this e-mail address as KHAN's.

      f.   I found an e-mail dated December 01, 2020, from "akavionics1@gmail.com" to "aman@calaircorp.com."  The attachments included a photograph of parts, two testing reports, two FAA Forms 8130-3, and one COC. The bottom of the e-mail read, "Sent from my T-Mobile 4G LTE Device." Because this e-mail was sent from "akavionics1@gmail.com," I believe that this was KHAN sending photographs taken on his cell phone to his work e-mail.

      g.   I found a second e-mail dated December 20, 2020, from "akavionics1@gmail.com" to "aman@calaircorp.com."  The e-mail contained one attachment. The attachments was a photograph of an FAA Form 8130-3. The bottom of the e-mail read, "Sent from my T-Mobile 4G LTE Device." Because this e-mail was sent from "akavionics1@gmail.com," I believe that this was KHAN sending a photograph taken on his cell phone to his work e-mail.

      h.   I found an e-mail, dated December 06, 2017, from "aman@calaircorp.com" which read, "We supply several F-15 parts and assemblies to United States government. We manufacture many other aircraft components as well." The e-mail was signed "Aman Khan."

**M.   Federal Search Warrant for Hard Drive**

62.  On February 10, 2021, the Honorable Karen E. Scott, United States Magistrate Judge for the Central District of California, authorized a warrant to search a hard drive containing the contents of KHAN's laptop computer. I reviewed

the files seized pursuant to that warrant and learned the following:

> a.   The hard drive contained at least seven Microsoft word document versions of COCs electronically signed with the name "John Lubadnick" in various Microsoft fonts. Based on the properties of six of the COC documents, dated April 09, 2018, June 19, 2018, September 25, 2018, October 16, 2018, October 25, 2018, and November 11, 2018, the author was user "Marshal Heingartner" and the document was last saved by user "Aman Khan."  All of the COCs were for aircraft parts and addressed to aviation companies.

> b.   I also found Microsoft Word documents containing the CAAC logo for quotes, invoices, and shipping forms prepared for CAAC customers.

> c.   I also found technical drawings for aircraft parts labeled as "Wing Joint Fitting – Lower Surface Center Wing" and "Piston Assy."

**N.    Premises to be Searched**

63.   On October 23, 2020, CW-1 told DOC SA Olivo and me that KHAN operates CAAC out of and lives at SUBJECT PREMISES #1. CW-1 also said that business records were stored on shelves at SUBJECT PREMISES #1. CW-1 drew a diagram of SUBJECT PREMISES #1 and labeled areas where customer files were stored.

64.   In my review of e-mail accounts, I found a copy of a lease between CAAC and Mueller-Adams L.P. for SUBJECT PREMISES #1.  The lease is effective from September 1, 2018 through September 30, 2021.  The agreed use of the space is described

as, "manufacturing, storage, and distribution of airplane parts."

65. In my review of Citibank records I received through February 2022, I found monthly checks written to Muller-Adams with the word "rent" written on the memo line, signed by Aman Khan. The most recent check was dated February 1, 2022. Beginning in about December 2021 through February 2022, KHAN signed checks payable to Muller-Adams with the memo line indicating that the payments were for both SUBJECT PREMISES #1 and SUBJECT PREMISES #2.

66. SUBJECT PREMISES #2 is located on the opposite side of the same building as SUBJECT PREMISES #1. The entrance to SUBJECT PREMISES #1 faces southeast and the entrance to SUBJECT PREMISES #2 faces northwest.

67. I conducted internet research and learned that on February 17, 2022, KHAN registered a business identified as United Technologies Company LLC ("United Technologies") with the California Secretary of State and provided a business address of 2900 Adams Street, Suite A-23, Riverside, CA 92504 (SUBJECT PREMISES #2). According to that registration, the stated purpose of United Technologies is manufacturing. The manager is Julie Au and the service of process agent is Alex Martin. The 2002 criminal case against KHAN involved a business that KHAN operated under a similar name – United Aircraft and Electronics.

68. On March 4, 2022, Canamidex's attorney Kimberly Jaimez forwarded me an e-mail she received from Alex Martin at CAAC

dated March 2, 2022. The signature block included SUBJECT PREMISES #1 as the address for CAAC.

### O.  Surveillance

69.  On January 10, 2021, SA Olivo conducted surveillance at SUBJECT PREMISES #1. Based on his report, SA Olivo observed two vehicles registered to KHAN parked at SUBJECT PREMISES #1. SA Olivo observed a man inside SUBJECT PREMISES #1 that matched the description of KHAN working in the front office reviewing documents.

70.  On March 22, 2021, I conducted surveillance at SUBJECT PREMISES #1 and observed two parking stalls that read, "Exclusive parking for CAAC" occupied by a vehicle registered to KHAN and a second vehicle registered to Kathleen Clowett ("Clowett").

71.  On August 20, 2021, I conducted surveillance at SUBJECT PREMISES #1 and observed two parking stalls that read, "Exclusive parking for CAAC" occupied by a vehicle registered to KHAN and a second vehicle registered to David Correa. I also observed that the warehouse door was open and a forklift was parked in front of the warehouse door.

72.  On August 25, 2021, DCIS SA Oravecz, FBI SA Rankin, and DCIS SA Eric Braun conducted surveillance at SUBJECT PREMISES #1. Based on their report, agents observed a vehicle registered to KHAN parked outside. SA Oravecz also observed an individual's lower extremities through the warehouse door, which was slightly open.

73.  On September 21, 2021, FBI SA Rankin conducted surveillance at SUBJECT PREMISES #1 and, based on his report, observed a vehicle registered to KHAN, a vehicle registered to Clowett, and a vehicle registered to David Davila outside of SUBJECT PREMISES #1.

74.  On September 27, 2021, DCIS SA Oravecz conducted surveillance at SUBJECT PREMISES #1. Based on his report, SA Oravecz observed a large manufacturing machine inside SUBJECT PREMISES #1 warehouse and a male matching the description of KHAN talking to a Hispanic male outside of SUBJECT PREMISES #1.

75.  On September 29, 2021, I conducted surveillance at SUBJECT PREMISES #1. At approximately 10:33 a.m., I saw a vehicle registered to KHAN arrive and park in a parking stall reserved for SUBJECT PREMISES #1. I saw a male matching KHAN's description exit the vehicle. At approximately 12:15 p.m., I saw a male matching KHAN's description speaking to a female in front of SUBJECT PREMISES #1' warehouse door.

76.  On February 7, 2022, DCIS SA Oravecz and DCIS SA Eric Braun conducted surveillance at SUBJECT PREMISES #1. Based on their report, I know that agents observed a vehicle registered to KHAN and a second vehicle registered to Cheryl Truong parked outside SUBJECT PREMISES #1.

77.  On March 7, 2022, SA Olivo conducted surveillance at SUBJECT PREMISES #1 beginning at approximately 7:25 p.m. Based on his report, I know that he observed two vehicles registered to KHAN parked outside SUBJECT PREMISES #1.  SA Olivo also observed a man matching the description of KHAN inside SUBJECT

PREMISES #1 office who appeared to be working and reviewing documents.

78.   On March 15, 2022, SA Olivo conducted surveillance at SUBJECT PREMISES #1.  Based on his report, I know that he observed two vehicles registered to KHAN parked outside SUBJECT PREMISES #1.  SA Olivo also observed a person inside SUBJECT PREMISES #1 who appeared to be watching television.

79.   On March 18, 2022, I conducted surveillance at SUBJECT PREMISES #1.  I saw a vehicle registered to KHAN and a second vehicle registered to Cheryl Truong parked in front of SUBJECT PREMISES #1.  I also saw the warehouse door at SUBJECT PREMISES #1 slightly open and could see large barrels and the bottom portion of what appeared to be an industrial machine.

80.   On March 18, 2022, SA Olivo conducted surveillance at SUBJECT PREMISES #1 and SUBJECT PREMISES #2.  Based on his report, I know that he observed a vehicle registered to KHAN and a second vehicle registered to Cheryl Truong parked outside of SUBJECT PREMISES #1.  SA Olivo observed that SUBJECT PREMISES #2 was closed and did not display a business name or hours of operation. SA Olivo looked through the window of suite A-23 and saw a small reception office with a desk and noted that the reception area appeared to lead to a larger office space.

81.   On March 29, 2022, I conducted surveillance at SUBJECT PREMISES #1 and SUBJECT PREMISES #2.  At approximately 8:11 a.m., I saw a male matching KHAN's description exit SUBJECT PREMISES #1 with a female matching the description of Clowett and set up a small outdoor garden table.  Two vehicles

registered to KHAN and one vehicle registered to Cheryl Truong were parked directly in front of SUBJECT PREMISES #1. At approximately 8:41 a.m., while conducting surveillance at SUBJECT PREMISES #2, I saw the same female matching Clowett's description walk toward and appear to enter SUBJECT PREMISES #2. I also saw a vehicle registered to Clowett parked in front of the warehouse door for SUBJECT PREMISES #2.

82. On April 6, 2022, SA Olivo and I conducted surveillance at SUBJECT PREMISES #1 and SUBJECT PREMISES #2. We observed two vehicles registered to KHAN parked in front of SUBJECT PREMISES #1. At approximately 6:45 a.m., I saw a vehicle registered to Clowett arrive and park in front of SUBJECT PREMISES #2. I saw a female matching Clowett's description exit the vehicle and enter SUBJECT PREMISES #2. At approximately 7:34 a.m., SA Olivo saw the same female matching Clowett's description enter SUBJECT PREMISES #1. At approximately 8:03 a.m., I saw a male matching KHAN's description and a female matching Clowett's description loading what appeared to be flat cardboard boxes into the trunk of one of KHAN's vehicles outside of SUBJECT PREMISES #1. The female left on foot and the male drove off in the vehicle. At approximately, 8:18 a.m., SA Olivo saw the same male and female arrive at SUBJECT PREMISES #2, retrieve items from the trunk of the vehicle registered to KHAN, and take them inside SUBJECT PREMISES #2. At approximately 8:39 a.m., SA Olivo saw the male leave SUBJECT PREMISES #2 on foot. At approximately 8:42 a.m.,

I saw the male matching KHAN's description use keys to unlock and enter SUBJECT PREMISES #1.

83.  I believe that evidence of the Subject Offenses will be found in a search of SUBJECT PREMISES #1 and SUBJECT PREMISES #2 for the following reasons:

a.  CAAC uses SUBJECT PREMISES #1 as its business address.

b.  KHAN's aircraft component business activities appear to be permeated by fraud, as seen in both the quantity and nature of the complaints reported by multiple CAAC customers.

c.  My review of the most recent financial documents available shows that since December 2021 KHAN is paying rent for SUBJECT PREMISES #1 and SUBJECT PREMISES #2.

d.  KHAN's newly registered company, United Technologies, lists SUBJECT PREMISES #2 as its business address. That company has a stated purpose of manufacturing, and has a name similar to KHAN's previous company United Aircraft and Electronics.

e.  I witnessed an individual matching KHAN's description and an individual believed to be a CAAC employee, Kathleen Clowett, at both SUBJECT PREMISES #1 and SUBJECT PREMISES #2.

**P.   Training and Experience on the Subject Offenses**

84.  Based on my training, experience, knowledge, and participation in criminal investigations, and accumulated knowledge from consultations with other law enforcement agents,

I know and contend that offenders involved in aircraft parts fraud and export violations keep records of their illegal activities for a lengthy period of time extending substantially beyond the time during which they produce, market, sell, and profit from their crimes. These records can include customer transaction records, airworthiness documentation, technical drawings of aircraft parts, shipping documents, and export records. Offenders commonly maintain hard copy and computer files, books, records, receipts, notes, ledgers, journals, diaries, address books, and other various materials and documents relating to their crimes.

**Q.   Training and Experience on Digital Devices**

85.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

86.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

87.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V. <u>CONCLUSION</u>

88.  For all the reasons described above, there is probable cause to believe that KHAN has committed a violation of Title 18 U.S.C. § 38 (Fraud Involving Aircraft or Space Vehicle Parts in Interstate or Foreign Commerce).  There is also probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B to this affidavit, will be found in a search of SUBJECT PREMISES #1 and SUBJECT PREMISES #2, which are further described above and in Attachments A-1 and A-2 of this affidavit.


/s/
_____
Cristina Jones, Special Agent
U.S. Department of
Transportation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13th day of
April, 2022.

_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED

SUBJECT PREMISES #1 is located inside the Adams Business Park at 2900 Adams Street, Suite A-10, Riverside, CA 92504. The Adams Business Park is accessible on the west side of Adams Street in the city of Riverside, CA.  The Adams Business Park is made up of three large building structures, with white exterior walls, grey concrete trim, and black tinted windows. The three structures are marked A, B, and C, with office suites facing northwest and southeast.  SUBJECT PREMISES #1 is located in the building marked "A" and identified as suite "A 10" on the exterior wall with its main entrance facing southeast. SUBJECT PREMISES #1 is a two-story commercial office space with an attached warehouse, measuring approximately 1,777 square feet in size.

## ATTACHMENT A-2

PREMISES TO BE SEARCHED

SUBJECT PREMISES #2 is located inside the Adams Business Park at 2900 Adams Street, Suite A-23, Riverside, CA 92504. The Adams Business Park is accessible on the west side of Adams Street in the city of Riverside, CA.  The Adams Business Park is made up of three large building structures, with white exterior walls, grey concrete trim, and black tinted windows. The three structures are marked A, B, and C, with office suites facing northwest and southeast.  SUBJECT PREMISES #2 is located in building marked "A" and identified as suite "A 23" on the exterior wall with its main entrance facing northwest. SUBJECT PREMISES #2 is a two-story commercial office space with an attached warehouse.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 38 (Fraud Involving Aircraft or Space Vehicle Parts in Interstate or Foreign Commerce), 18 U.S.C. § 1343 (Wire Fraud), and 13 U.S.C. § 305 (Penalties for Unlawful Export Information Activities) (collectively, the "Subject Offenses"), namely:

a.    Information relating to the ownership, operations, marketing, or sales of California Aircraft and Avionics Corporation or United Technologies Company LLC.

b.    Information related to any transactions by California Aircraft and Avionics Corporation or United Technologies Company LLC involving the sale and/or purchase of aircraft parts including, but not limited to: purchase orders ("PO's"), invoices, bills-of-sale, processing documents, accounts receivable and payable, banking records, checks, financial records, internal notes, delivery receipts, inventory control, shipment and receiving records, memoranda, phone records, telephone messages and records, minutes, diaries, part or material certificate forms, certificates of conformance, airworthiness approval records, work orders, work scopes, serviceability tags/documents, capability lists, work order logs/cards, customer other PO's, repair orders, material control forms, FAA Form 8130's, calibrations certifications and other FAA related documents, inspection reports, teardown reports, status reports, records of repair and or overhaul, vendor

supplied documents, test data, rejection notices, manuals, plans, parts lists, diagrams, schematics, drawings, specifications, shop travelers, contracts, and packing slips.

      c.  Any and all documents pertaining to FAA regulations concerning the manufacture, repair, distribution, and airworthiness of aircraft parts, including but not limited to, correspondence, orders, publications, advisory circulars, airworthiness directives, contracts, regulations and certifications.

      d.  Any and all documents, records, communications and information referencing the name "Alex Martin" or the name "John Lubadnick".

      e.  Any and all aircraft parts that appear to have been handled contrary to the Federal Aviation Regulations.

      f.  Indicia of occupancy, residency, and/or ownership of SUBJECT PREMISES #1 or SUBJECT PREMISES #2 including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners, not to exceed fifteen items;

      g.  Any records, documents, programs, applications, and materials consisting of or relating to communications with any representatives of aviation companies that are located domestically or abroad;

      h.  Information related to the sale, purchase, transfer, shipment, transshipment, export and/or re-export of

any goods, technology, or equipment from the United States, including, but not limited to, information related to items scheduled to be transferred, shipped, transshipped, and/or exported, or items intended to be transferred, shipped, transshipped, and/or exported from the United States to other foreign countries, and including any information related to the negotiation or planning for any such shipments or transactions even if such shipments or transactions did not occur;

　　　　i.　Information related to the identity of any individuals or companies or other corporate entities assisting in the transfer, export, re-export, shipment and/or transshipment of items from the United States, including, but not limited to, information related to the location of said individuals, including codenames, abbreviations, and references;

　　　　j.　Information describing or referencing financial or banking transactions associated with the transfer, export, re-export, shipment and/or transshipment of items from the United States to foreign countries;

　　　　k.　Information identifying all means of communication (i.e., telephone numbers, email, social media, or any other electronic accounts) used in the purchase, sale, negotiation, transfer, export, re export, shipment, and/or transshipment of items from the United States;

　　　　l.　Information sufficient to identify any financial accounts of KHAN, California Aircraft and Avionics Corporation, or United Technologies Company LLC.

v

m.   Documents, records, or communications showing or relating to export or sanction laws or regulations.

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, or saved usernames and passwords;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   records of or information about Internet Protocol addresses used by the device;

4.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

I.   **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

   c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may also retain a digital device if the government, prior to the end of the search period,

obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x